**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**FLORINDA ZAMORA,**

     **Plaintiff,**

     **v.**                         **Case No. 17-CV-2261-JAR**

**UNIFIED GOVERNMENT OF WYANDOTTE**
**COUNTY AND KANSAS CITY, KANSAS,**

     **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff Florinda Zamora ("Zamora") brings this action against Defendant Unified Government of Wyandotte County and Kansas City, Kansas (the "UG"), alleging that the UG violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*., when it terminated her employment at the Wyandotte County Juvenile Detention Center ("JDC") in retaliation for reporting a coworker's inappropriate conduct toward a juvenile resident. This matter is now before the Court on the UG's Motion for Summary Judgment (Doc. 75). The motion is fully briefed, and the Court is prepared to rule. For the reasons set forth in depth below, the UG's motion is denied.

**I.**     **Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom

---

[1] Fed. R. Civ. P. 56(a).

in the light most favorable to the nonmoving party.[2]  "There is no genuine [dispute] of material

fact unless the evidence, construed in the light most favorable to the non-moving party, is such

that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if,

under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A

dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of

fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact

and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant

who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's

claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant

on an essential element of the nonmovant's claim.[7]

Once the movant has met the initial burden of showing the absence of a genuine dispute

of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that

there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings

to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be

---

[2]*City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4]*Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Adler,* 144 F.3d at 670 (citing *Anderson,* 477 U.S. at 248).

[6]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[9]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[11]  To successfully oppose summary judgment, the nonmovant must bring forward "more than a mere scintilla of evidence" in support of his position.[12]  A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[13]  Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  When examining the underlying facts of this case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[15]

## II.     Factual Background

### A.     Hearsay Objections to Zamora's Statements of Fact

Before turning the parties' statements of fact, the Court will briefly address the UG's objections to two of Zamora's statements of fact.  Summary judgment evidence need not be "submitted 'in a form that would be admissible at trial.'"[16]  But "the content or substance of the evidence must be admissible."[17]  Under Fed. R. Civ. P. 56(c)(2), a party may object on this

---

[10]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see Kannady,* 590 F.3d at 1169.

[11]*Adler*, 144 F.3d at 671.

[12]*Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir. 1993).

[13]*Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986).

[16]*Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[17]*Id.* (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)).

basis—that the material "cannot be presented in a form that would be admissible in evidence." Indeed, as the advisory committee notes to the 2010 Federal Rule amendments explain: "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."[18]

The UG objects to Zamora's Statements of Fact 78 and 117 on the basis that they contain inadmissible hearsay, meaning a statement that the declarant does not make while testifying at the current trial or hearing and that a party offers to prove the truth of the matter asserted.[19] Hearsay is inadmissible except as provided by law,[20] and hearsay within hearsay is excluded unless each part of the combined statement conforms with an exclusion from or exception to the rule against hearsay.[21]

Zamora's Statement of Fact 78 relies on the deposition testimony of Kansas City, Kansas Police Detective Vincent Kingston concerning statements made to him—during the course of his investigation of the events underlying this case—by JDC employee Ryan Schuler, about what was said to Schuler by another JDC employee, Kelsey Davis, concerning something Davis heard from a Sheriff's Office employee, Andrew Carver. Similarly, Zamora's Statement of Fact 117 refers to Davis's "testimony" about the "exact words" Zamora said about Davis to another of the Sheriff's Office employee, Daniel Anderson, which Anderson then repeated to Carver and

---

[18]Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment; *see also Brown*, 835 F.3d at 1232 ("The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form." (quoting 11 James Wm. Moore et al., Moore's Federal Practice–Civil § 56.91 (3d ed. 2015))); *O'Connor v. Williams*, 640 F. App'x 747, 750 (10th Cir. 2016).

[19]Fed. R. Evid. 801(c).

[20]Fed. R. Evid. 802 ("Hearsay is inadmissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court.").

[21]Fed. R. Civ. P. 805.

Carver relayed to Davis. The source cited to support this fact is the deposition testimony of an investigating Sheriff's detective, Sherry Simpson, about Davis's unsworn statement to her. It is not entirely clear which portions of these statements of fact the UG objects to because the UG makes largely identical factual assertions in its own briefing.[22] It appears that the UG objects not to evidence offered to establish that these conversations occurred or even the general content of the conversations, but to evidence offered to prove the exact words that were said.

While Fed. R. Civ. P. 56(c)(1)(A) permits Zamora to support her factual assertions at the summary judgment stage by citing to deposition testimony,[23] the content or substance of the deposition testimony must be otherwise admissible.[24] Zamora does not argue for the admissibility of the triple and quadruple hearsay statements contained within Kingston's and Simpson's deposition testimony, and the Court finds no exclusion or exception that applies for each level of hearsay.[25] Accordingly, while the Court does not omit facts relied upon by both

---

[22]*See, e.g.*, Doc. 76 ¶¶ 71, 82; Doc. 82 at 12 ¶ 56; 16 ¶ 81.

[23]Fed. R. Civ. P. 56(c)(1)(A).

[24]*Wunder v. Elettric 80, Inc.*, No. 13-4014-KGS, 2014 WL 4059763, at *2 (D. Kan. Aug. 15, 2014) ("[A]lthough evidence presented in the form of an affidavit or deposition testimony at the summary judgment stage can be 'converted' in form into live testimony at trial, the content or substance must be otherwise admissible, and any hearsay contained in an affidavit or deposition remains hearsay beyond a court's consideration." (citation omitted)). Although not relied upon by Zamora, the same statements appear in Kingston's and Simpson's written investigative reports, which are also part of the record in this case.

[25]Carver, Anderson, Schuler, Davis, and Zamora were all UG employees, and a statement of a party opponent is not hearsay under Fed. R. Civ. P. 801(d)(2)(D) when the statement is "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). In the employment context, however, the Tenth Circuit holds that "[i]n order for a statement to qualify as an admission of a party opponent, the speaker 'must be involved in the decision[-]making process affecting the employment action involved.'" *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) (per curiam) (quoting *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003)); *see also Johnson v. Weld Cty.*, 594 F.3d 1202, 1208–09 (10th Cir. 2010) (citing *Jaramillo*, 427 F.3d at 1314). None of these individuals "had management or final decision-making authority" in the process leading to Zamora's firing. *DuHall v. Lennar Family of Builders*, 382 F. App'x 751, 755 (10th Cir. 2010); *see also Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1202–03 (10th Cir. 2015). Further, Zamora, the proponent of the evidence and the original speaker of the statement at issue in Statement of Fact 117, is not a party opponent in her own case. *See, e.g., Jordan v. Binns*, 712 F.3d 1123, 1127–28 (7th Cir. 2013) (citations omitted).

parties, it does exclude hearsay statements in Zamora's Statements of Fact 78 and 117 to the extent that they are offered for the truth of the matter asserted.

## B.     Uncontroverted Facts

With the above rules of law and evidence in mind, the following material facts are either uncontroverted or, if controverted, construed in the light most favorable to Zamora.[26]

### 1.     Wyandotte County Juvenile Detention Center

The UG is a municipality located in Wyandotte County, Kansas City, Kansas, and a recipient of federal financial assistance. The JDC is a division of the Wyandotte County Sheriff's Office ("Sheriff's Office") within the UG. The JDC is licensed by the Kansas Department of Children and Family Services ("DCF") as a child-care facility under Kansas law, and is subject to detailed regulations. DCF monitors the JDC's compliance with regulations and can revoke its license for failure to comply.

The JDC is licensed to hold forty-eight juveniles, both male and female, from the ages of ten to seventeen. JDC residents are juvenile offenders facing criminal charges; many have behavioral problems and/or have been raised in difficult environments. Some residents have been abused, some are gang members, and many have a history of substance abuse. The JDC is a secure facility, and residents are not permitted to leave. All entrances and exits are under the exclusive control of the staff and are continuously monitored. Residents are housed in one of four pods, each with eight to sixteen rooms. The pods are locked and access is limited; at night, residents are required to be in their rooms and the doors are locked from the outside. There are security cameras throughout the facility, and monitors are set up in a control booth. JDC

---

[26]Factual disputes about immaterial matters are not relevant to a summary judgment determination. Therefore, immaterial facts and factual averments not supported by the record are omitted. *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1361 (10th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

residents are supervised by juvenile care workers, also called juvenile detention officers. At least one juvenile detention officer is assigned to each pod at all times, and juvenile detention officers control the movements of residents and supervise them twenty-four hours per day.

Don Ash is Sheriff of the Sheriff's Office and, by law, has charge and custody of the JDC. At all relevant times, Jeff Fewell, a Colonel in the Sheriff's Department and Warden of the JDC, was responsible for the custody, care, control, safety, and security of the juvenile residents of the JDC. He reported to Undersheriff Larry Roland and to Sheriff Ash. Terri Broadus, the JDC Administrator, was responsible for administering all operations of the JDC and reported to Fewell.

Major Daniel Soptic, Lieutenant Colonel Robert Gunja, Detective Sherry Anderson-Simpson ("Simpson"), and Deputy Daniel Anderson were all employed by the Sheriff's Office in the roles indicated by their titles. Andrew Carver was a detective in the Sheriff's Office and, during the events underlying this action, was promoted to captain. Vincent Kingston was a detective in the Internal Affairs Division of the Kansas City, Kansas Police Department.

Plaintiff Florinda Zamora was employed as a juvenile detention officer at the JDC, as were Kelsey Davis, Angela Garcia, Kathy Harrington, Peair Howard, Ryan Schuler, and Jaya Paden. During the time period at issue, Davis was engaged to Carver, and they are now married. Lieutenant Jelani Coppage was a shift supervisor at the JDC, overseeing juvenile detention officers. Adrienne Gilchrist was also a lieutenant at the JDC. Duane Olden was a JDC maintenance worker. Minors J.K., B.R., and N.C. were male residents at the JDC.

## 2.      Juvenile Detention Center School

DCF regulations applicable to the JDC require that "[c]lassroom instruction . . . be provided on-site by teachers holding appropriate certification from the Kansas board of education," and that "[e]ducation services shall be coordinated with the local school district."[27] In accordance with regulations, the JDC coordinates with the Kansas City, Kansas Unified School District No. 500 ("School District") to provide educational services to JDC residents. The School District is provided with classroom space inside the JDC and, during the school year, the School District provides residents with six hours of instruction per day, from 7:00 am to 3:30 pm, excluding weekends and holidays.

The School District independently administers and operates the school inside the JDC. The School District employs and assigns the principal, the teachers, and other support personnel. The School District determines the curriculum and monitors the students' progress, and provides all books, materials, and supplies.  The JDC has no input into staffing or programming for the school, and the classrooms are separate from the pods where JDC residents live.  However, as required by regulations, at least one juvenile detention officer is stationed in each classroom and directly observes classroom activity to provide support to the teacher.  The juvenile detention officer's function is to provide security and to help insure order, not to assist with instruction.

Neither the UG nor the Sheriff's Office has entered into a contract with the School District concerning the JDC school.  The UG and the Sheriff's Office do not pay any funds to the School District for administering and operating the School, nor do the UG, the Sheriff's Office, or the JDC receive any payment from the School District for providing classroom space or

---

[27]Doc. 76 ¶ 10 (quoting Kan. Admin. Regs. § 28-4-355(b) (2019)).

security for the school.  Like the UG, the School District is a recipient of federal financial assistance.  The School District is subject to Title IX.

### 3. Unified Government's Policies Regarding Sexual Harassment

Per its Human Resources Guide, the UG "will not tolerate harassment of employees," including sexual harassment.[28]  Sexual harassment is prohibited in the workplace and in any location that could be regarded as an extension of the workplace.  The UG's policy states that sexual harassment may be "subtle and indirect," and includes conduct "between individuals in a hierarchal relationship" or conduct "aimed at coercing an individual to participate in an unwanted sexual relationship."[29]  Inappropriate behavior that constitutes sexual harassment can include a wide variety of conduct, including physical contact or touching of a sexual nature, flirtations, and unnecessary proximity to another person.

The UG "encourages employees to report harassment *before* it becomes severe or pervasive.  Even if harassment does not rise to the level of a violation of federal or state law, the Unified Government will take action to stop it."[30]  The UG acknowledges that "[i]t is unlawful to retaliate against an employee for filing a complaint of harassment or cooperating in an investigation of a complaint of harassment."[31]  Additionally, the UG states that it "will not tolerate retaliation against an individual who in good faith reports harassment or provides information related to a complaint of harassment."[32]

---

[28]Doc. 79-13 at 1.

[29]*Id*. at 2.

[30]*Id*. at 3 (emphasis in original).

[31]*Id*.

[32]*Id*.

The JDC has a manual for juvenile residents that includes rules of conduct.  Rule 5 states that physical contact is prohibited and that criminal charges could be filed for touching another resident or staff member in a sexual manner.

### 4.    Unified Government's Policy on the Disclosure of Confidential Information

The JDC maintains a Release of Information policy.  All juvenile detention officers are given a copy of this policy, and Zamora believes that she probably received a copy.  The Release of Information policy states: "It is the policy of the Juvenile Detention Center to ensure that all juvenile records are safeguarded from unauthorized or improper disclosure."[33]  The policy further provides that "[a]ll juvenile case record information is confidential," and that "access to case records shall be limited to persons and agencies which can demonstrate that the information will serve a criminal justice purpose."[34]  "Juvenile case record information" includes all records maintained by the JDC on residents and the information in them.

Under the Release of Information policy, "[a]ny disclosure of record material to unauthorized persons or agencies constitutes a [breach] of trust and is restricted by law."[35]  The policy specifies that only certain staff members are authorized to disclose case information, namely the JDC Administrator, Deputy Administrator, Juvenile Captain, Intake Lieutenant, and "[o]ther Staff Members upon receipt of written permission from the Administrator."[36]  The policy restricts access to juveniles' records and files to specified individuals and agencies.  Those

---

[33]Broadus Aff., Ex. C, Doc. 76-9 at 10.

[34]*Id.*

[35]*Id.*

[36]*Id.*

who have access to juveniles' records and files include "Juvenile Detention Center staff in the performance of authorized job duties."[37]

A copy of an incident report that concerns a JDC resident is placed in the resident's file. The report is considered confidential under the Release of Information policy, and the unauthorized release of the report or the information contained therein is a violation of the policy.

### 5. First Investigation of Davis Uncovering Multiple Instances of Inappropriate Contact with a Juvenile Resident

On May 25, 2016, Zamora was cleaning the windows in the control booth, which overlooks the pod where Davis was working. Harrington was also present in the control booth. Both Zamora and Harrington observed Davis walking with J.K., a seventeen-year-old male resident. Zamora observed J.K. walking on the left side of Davis with his right arm around her waist, and Davis with her left hand on J.K.'s right shoulder. Davis was talking to J.K., but Zamora could not hear what she was saying. Zamora believed that Davis's conduct toward J.K. was inappropriate because "it's jail," and "you don't walk around the pod like that."[38] However, Zamora did not consider Davis's conduct with J.K. to be "sexual behavior," in that it was not "intercourse or . . . groping of parts,"[39] and had never seen Davis behave that way before. The incident was captured on video.

Zamora immediately informed her shift supervisor, Lieutenant Coppage, of what she had observed. Coppage responded, "You're right, you're right to report this,"[40] and told Zamora to

---

[37]*Id.*

[38]Zamora Dep., Doc. 76-7 at 111:14–25.

[39]*Id.* at 112:1–13.

[40]*Id.* at 117:17–20.

submit a written report. Both Zamora and Harrington submitted written reports on May 25 regarding the physical behavior between Davis and J.K. Zamora's report stated: "I officer Zamora Florinda . . . was cleaning the control booth with officer Kathy Harrington . . . in the booth and I observed resident [J.K.] with his arms around officer Kelsey Davis . . . waist walking and her hand on his shoulder."[41] Harrington's written report on the same incident stated that Davis was "walking arm and arm with resident [J.K.]."[42] Harrington added that she was viewing Davis and J.K. on the control booth monitor and that Zamora—who was standing and looking down into the pod—had a better view of the situation.

After Zamora completed her written report, she also told Broadus, the JDC Administrator, what she had seen. Broadus, like Coppage, agreed that the May 25, 2016 incident between Davis and J.K. needed to be reported. While the UG did not take any immediate steps in response to the May 25 incident, Zamora did see a change in Davis's behavior toward the residents. Zamora noted that Davis no longer went into residents' rooms and, while she would still sit and talk with residents, she no longer bent over tables while doing so. Rather, Davis would keep her distance from residents and appeared to have corrected her behavior.

On July 14, 2016, Harrington submitted a report on a second incident involving Davis, J.K., and another JDC resident, B.R. Harrington reported that on June 28, 2016, she observed Davis alone in the pod with the two residents, and that Davis was

> laying on the desk with her butt sticking out and resident B.R. was standing there looking at her. Resident J.K. was sitting on the phone stools talking to her, then Officer Kelsey Davis jumped on the desk and was laughing with J.K. he was touching her leg and holding her hand this is when I called Mr. Duane Olden . . . , because I wasn't

---

[41]Doc. 76-8 at 1.

[42]*Id*. at 13.

12

> able to get in touch with anyone else I felt I needed a witness to this, Mr. Duane Olden came to the control booth. To view the situation.[43]

Olden also wrote a report about this incident, stating that he was called to the control room by Harrington to view activity in the pod and witnessed

> K. Davis sitting on the edge of the desk with a black male resident sitting down on the telephone stool between the legs of the officer rubbing her up and down. As I observed this going on for about five minutes while another resident sat next to them both while this was going on. When the slider door opened Officer Davis immediately jumped off the desk and the resident turned around like nothing was going on.[44]

Olden thought it was "really out of character for an employee to be interacting with a resident in that way."[45] Zamora was not present during and did not observe the second incident involving Davis and J.K. Like the May 25 incident, the June 28 incident was recorded on video.

At the time of the two foregoing incident reports, Davis was engaged to Carver, a detective in the Sheriff's Office who was normally responsible for investigating allegations of employee misconduct. Because of the relationship between Carver and Davis, Sheriff Ash decided to ask the Kansas City, Kansas Police Department's Internal Affairs Unit ("KCKPD Internal Affairs") to investigate the allegations against Davis. Captain Soptic, who supervised the Sheriff's detectives, along with his supervisor, Lieutenant Colonel Gunja, told Carver that there was a complaint against his fiancée and that Carver would not be involved in the investigation. Soptic and Gunja did not go into the details of the allegations, apart from mentioning that there was a video showing Davis's conduct with two JDC residents and that it

---

[43]*Id.* at 14.

[44]*Id.* at 15.

[45]*Id.* at 8.

looked like "high school flirting."[46]  When Carver asked Soptic if he believed Davis was guilty and what he should do, Soptic encouraged him to "have those discussions with [Davis]."[47]

Davis first found out about the investigation from Carver, who spoke to her about it before she was interviewed.  Carver told Davis that there was a video of her conduct.  On July 14, 2016, Broadus called Davis to advise her that an outside agency would be investigating allegations against her.  Broadus told Davis that she could not give her any details about the allegations.

At some point, Zamora told Deputy Anderson about the incident involving Davis and J.K. that she witnessed in May 2016.  Anderson, who was close friends with Carver, worked in the Sheriff's Office and was assigned to patrol.  Anderson did not work in the JDC and Zamora testified that she had never seem him there.  Zamora recalled that Anderson responded, "I'm going to tell my buddy [Detective Carver].  That's his girlfriend."[48]  Zamora testified that she asked Anderson not to repeat what she had said about the May 2016 incident to Carver.

Detective Kingston from KCKPD Internal Affairs was assigned to conduct the investigation into the reported incidents involving Davis, and that investigation officially began on July 18, 2016—more than fifty days after the first observed incident of Davis inappropriately touching a juvenile resident on May 25.  On July 19, 2016, Kingston took a statement from Zamora in which she recounted what she had observed on May 25.  Zamora also told Kingston that on a subsequent occasion, she and Schuler had observed Davis and J.K. sitting next to each other, with J.K.'s head resting on Davis's shoulder.  Zamora did not report this additional incident when it occurred.  Her account of this interaction between Davis and J.K. is consistent

---

[46]Doc. 79-15 at 2.

[47]Soptic Dep., Doc. 46-6 at 10:10–20.

[48]Zamora Dep., Doc. 76-7 at 127:13–16.

with Schuler's witness statement to Kingston; Schuler also stated his belief that Davis's actions on this occasion were inappropriate.

Zamora further reported that if Davis was playing cards with J.K., she would lean across the table with "her rear end up in the air and just sit there and talk with him."[49] Zamora told Kingston that she believed Davis's behavior was unusual because "you don't act like that with children."[50] When Kingston asked her whether, based on her training and experience, she believed that Davis had used poor judgment, Zamora agreed that Davis had. However, Zamora also stated that she was unaware of any policy or training that addressed Davis's conduct with J.K. The UG concluded that Zamora truthfully reported the inappropriate physical contact between Davis and J.K.

On August 5, 2016, Kingston took a statement from Davis. Davis denied having an inappropriate relationship with any of the residents. She stated that she and the other officers were encouraged to form relationships with the kids and that she would "horseplay around" with them.[51] When talking with Kingston about still photographs taken from the May 25 video, Davis denied allowing J.K. to grab her side or tickle her. However, when Kingston emphasized that her May 25 interactions with J.K. were captured on video, she stated that she could not recall that particular interaction and that she would have told J.K to stop if he was touching her in that manner.

During additional questioning about the June 28 incident reported by Harrington and Olden, Davis denied allowing J.K. to touch her or touch her legs, but also stated that she could not remember everything about that encounter. She did ultimately recall that J.K. asked to see

---

[49]Doc. 76-10 at 5.

[50]*Id.*

[51]Doc. 76-8 at 22.

her engagement ring and that she let him look at it, and that she permitted J.K. strike her on the kneecap while she was explaining what reflexes are. Davis stated that she had allowed other residents to do the same. J.K. also tried to tie Davis's shoe. The video recording of the June 28 incident confirms that Davis did allow J.K. to touch her and to touch her leg. B.R. reported seeing Davis allow J.K. to touch her and stated that Davis treated J.K. more favorably than other residents.

Davis indicated that she had never been told by a supervisor not to let the residents touch her, nor had she been given any training about appropriate versus inappropriate conduct with residents. Detective Kingston testified that he could not speak to policies and procedures at the JDC, but that Davis's interactions with J.K. "would seem to be inappropriate."[52] He also testified that he believed that Davis "was not completely forthcoming" during the investigation.[53]

On August 31, 2016—over three months after Davis was first observed interacting inappropriately with a juvenile resident—Kingston completed his investigation and prepared a report summarizing the results. Warden Fewell did not read Kingston's report, but viewed the video recording of Davis's conduct on May 25, 2016. Although Fewell testified that Davis should have been terminated if she lied to investigators, there is no evidence regarding whether Kingston shared his belief regarding Davis's truthfulness with his superiors.

On October 11, 2016, Fewell suspended Davis for five working days without pay for engaging in horseplay and inappropriate conduct with juvenile offenders. Davis filed a grievance regarding her suspension. She asked that the five-day suspension be reversed, that a

---

[52]Kingston Dep., Doc. 79-6-4 at 24:9–10.

[53]*Id.* at 24:11–14.

non-disciplinary counseling statement be issued, and that training be provided on policy and procedure "so there is no confusion on what the employer[']s expectations are."[54]

Sheriff Ash reviewed Kingston's report, and later testified in this case that he "did not see or read anything that indicated that [Davis] wasn't [truthful]."[55] Ash also held a hearing on Davis's grievance, during which Davis maintained that she had not received adequate training on physical contact with juveniles. Davis contended that the line between appropriate and inappropriate contact between juvenile detention officers and juvenile residents had been blurred, and stated that she wanted there to be a clear delineation and additional training for officers.

Sheriff Ash concluded that Davis's conduct did not warrant a five-day suspension without pay, that Davis had demonstrated that training was not sufficient, and that they "needed to start with a written reprimand and training specific to address the alleged inappropriate behavior or conduct, and then work [their] way up from there in a progressive discipline manner rather than starting out with . . . a five-day suspension."[56] Sheriff Ash reversed Davis's suspension and directed that she be issued a written reprimand and provided with additional training. Fewell issued the reprimand on October 31, 2016.

6. **Additional Reports of Inappropriate Conduct by Davis and Garcia Toward Juvenile Residents**

In addition to the three reports of inappropriate physical contact between Davis and a juvenile resident covered by Kingston's report, the UG had received a fourth report on August 6, 2016, one day after Kingston took a statement from Davis and several weeks before he completed his investigation. Jaya Paden, also a juvenile detention officer at the JDC, reported

---

[54]Doc. 76-8 at 149.

[55]Ash Dep., Doc. 76-2 at 18:22–19:1.

[56]*Id.* at 18:7–12.

that one resident told her that Davis and Garcia were touching him and other juvenile residents inappropriately. Paden also reported that one resident told her that Davis and Garcia were allowing residents to touch them. Paden reported that the resident said, "it was more than touching going on."[57] Paden reported that the resident also told her that Davis and Garcia were bringing in items for residents from outside the JDC, including men's body wash and candy.

The UG admits that it is a violation of its policy for JDC staff and residents to touch one another. The UG also admits that it is a violation of both UG policy and state law for JDC staff to bring in outside items for juveniles. However, Fewell is not aware of the UG having conducted any investigation into Paden's allegations, nor has the UG produced any documents in this case reflecting that an investigation occurred. Paden's allegations are not addressed in Kingston's report.

As the JDC Warden, Fewell would have knowledge of any disciplinary action against Davis or Garcia for engaging in inappropriate physical contact with minors or smuggling contraband into the facility. Fewell testified that he is not aware of whether Davis and Garcia were disciplined, nor has the UG produced documents reflecting that they were disciplined for this conduct.

**7.    Second Investigation of Davis for Alleged Sexual Relationship with a Juvenile**

On November 9, 2016, Juvenile Detention Officer Howard reported to his supervisors that a JDC resident, N.C., had notified him that he (N.C.) had engaged in a sexual relationship with Davis after he was released from the JDC on a previous occasion. Howard also reported

---

[57]Doc. 79-5 at 3.

that N.C. told him that Davis had allowed N.C. to grope and touch her in a sexual manner while he was a JDC resident.

It was Howard's report that prompted a second investigation into Davis. As a result of his report, the Sheriff's Office opened a criminal investigation into N.C.'s allegations. The second investigation was conducted not by KCKPD Internal Affairs, but by Simpson, a Sheriff's Office detective with fourteen years of experience. Carver, Davis's fiancé, was not involved in the investigation of the allegations in Howard's report, nor did Simpson ever discuss those allegations with him. However, Simpson was Carver's colleague and, at some point during the relevant events, became his subordinate when he was promoted to captain. Pursuant to UG policy requiring that a JDC staff member under investigation be removed from contact with residents, Davis was removed from the pods and assigned to the control booth, where she had no contact with residents. Howard was first interviewed on November 17, 2016; the narrative summary of that interview does not mention Zamora.

On November 22, 2016, Garcia sent a written report to Simpson. In that report, Garcia stated that Davis informed her that "apparently Officer Florinda Zamora . . . told Adult Deputy Anderson that the dumb shit they said I did happened at your house."[58] Garcia indicated that Anderson had told Carver what Zamora said, and that Carver in turn told Davis. Garcia also stated in her report that she had informed Lieutenant Gilchrist of what she had been told "because [she] did not think that the investigation should have been discussed amongst peers after reported, nor taken to discuss with other employees on the adult side."[59] Gilchrist had advised her to type a report and send it to Simpson.

---

[58]Doc. 76-14 at 1.

[59]*Id.* at 2.

On November 30, 2016, after receiving Garcia's report, Simpson interviewed Anderson. During his interview, Anderson told Simpson that he talked to Zamora "once every blue moon."[60]  Anderson stated that Zamora had told him that Davis had sex with a juvenile, possibly at Garcia's house, and that he believed Zamora had indicated that she had obtained this information from Garcia.  Anderson also said that earlier, during the summer, Zamora had told him that she did not get along with Davis, and that Davis and Garcia were friends, hung out, and "always started stuff with her."[61]  Anderson said that on a separate occasion, Zamora had told him about a previous incident at the JDC involving a juvenile flirting with and touching Davis, and that Davis did not do anything about it.  Anderson believed that the juvenile involved in the incident inside the JDC was the same individual with whom Davis was alleged to have had a sexual relationship outside the facility.  Garcia was pulled into the criminal investigation when Anderson told Simpson what Zamora had said about the sexual encounter between Davis and a juvenile occurring at Garcia's home.

Simpson interviewed Zamora later on November 30, 2016, following her interview of Anderson.  When questioned, Zamora indicated that Howard had told her that N.C. stated that he had slept with Davis outside the JDC, and that she had told Howard that he had to report because they were mandated reporters.  Zamora never saw Howard's report and did not assist him with it, nor did she ever witness any inappropriate contact between Davis and N.C.  However, Zamora also told Simpson that N.C. told her in person that there was a rumor circulating about him sleeping with Davis.  Zamora also told Simpson about her prior reports on Davis in the spring.

---

[60]Doc. 76-8 at 75.

[61]*Id.* at 77.

Although Zamora testified that she personally did not believe the allegation that N.C. had sex with Davis, she did admit during questioning by Simpson that she told Anderson "what [N.C.] said to [her]" directly, specifically that there was a rumor circulating about N.C. "hooking up with Ms. Davis, having sex with Ms. Davis."[62]  Zamora told Simpson that when N.C. asked her if she had heard the rumor, she told him that she had not.  Zamora stated that she did not know whether Davis and the minor had had sex at Garcia's house, but that it was "more of . . . an assumption" (one she testified to sharing with Anderson) that any encounter would have happened there, based on the fact that Davis and Garcia were close and frequently hung out together, and that N.C. had also mentioned hanging out at Garcia's home with Garcia's children.[63]

At the time Zamora spoke with Anderson in the fall of 2016 about the allegations concerning N.C. and Davis, she was aware that Davis was engaged to Carver and that Anderson and Carver were friends.  She also knew that there was a possibility that what she was telling Anderson would get back to Carver.  Zamora did not tell Anderson that there was an investigation into Davis.

The day after interviewing Zamora, Simpson interviewed N.C., who denied having any type of relationship or physical contact with Davis.  N.C. also denied telling Howard that he and Davis were boyfriend and girlfriend or that they used to meet.  Further, N.C. denied telling Zamora that he knew Garcia outside the JDC.  Rather, he stated that his cousin went to school with Garcia's kids, so he had seen Garcia "at like football games, and they were like oh, how you doing."[64]  N.C. denied having been to Garcia's home.  Regarding the allegations under

---

[62]Doc. 76-12 at 7.

[63]*Id.* at 5–7.

[64]Doc. 76-8 at 82.

investigation, N.C. stated that "this [was his] first time hearing about it," and that he was "shocked."[65]

On December 21, 2016, Simpson interviewed Davis. Davis denied having any type of relationship with N.C., including a sexual relationship or associating with him outside the JDC. She did state that other juvenile detention officers and residents knew about the allegation that she was having sex with N.C. Davis stated that Zamora had told Anderson about the allegation when she knew that Anderson was a close friend of Davis's fiancé. Davis stated that she believed Zamora either wanted to make herself look good to Anderson or was trying to break up Davis and Carver's relationship. Simpson testified that Davis was upset and crying during her interview. Simpson also testified that she believed Davis, even though she did not talk to the investigator of the May 2016 incident. Davis gave notice of her resignation on the same date she was interviewed, December 21, 2016, and her resignation was effective January 11, 2017.

Sometime around January 3, 2017, Simpson transitioned the criminal investigation of Davis into an internal investigation of Zamora and Howard for "dishonesty, disclosing confidential information, harassment, interference with a criminal investigation, and failing to report."[66] On January 4, 2017, Simpson conducted a follow-up interviews with both Zamora and Howard. In her summary of her interview of Howard, Simpson later stated that

> Howard maintained that [N.C] had told him numerous times about his relationship with Davis. During the interview Howard stated multiple times that he never spoke to Zamora about the investigation or his report regarding [N.C.] and the sexual relationship with Officer Davis. When asked how Zamora knew about the investigation, Howard stated that [N.C.] told Zamora. Howard began telling us that one day he was working as a runner and Zamora was in the pod with him and he came in the pod and [N.C.] was talking to Zamora about the situation. He then stated that the only

[65]*Id.* at 91.

[66]Doc. 76-13 at 9.

> conversation he and Zamora had about what he had reported was
> that this kind of thing had happened before. . . . Later during the
> interview, Howard admitted that he and Zamora had conversations
> about [N.C.] and Davis but denied that it influenced his report.[67]

However, Simpson testified that she believed Zamora "was probably truthful" when she stated that she had advised Howard to make a report regarding Davis and N.C.[68]

Simpson completed her investigation and issued a report on January 12, 2017. In that report, Simpson "determined that the criminal investigation into Officer Kelsey Davis and Officer Angela Garcia was unfounded."[69] She wrote that during the criminal investigation of Davis and Garcia, she "discovered several inconsistencies in the statements provided by Officer Howard and Officer Zamora that led [her] to believe they were being untruthful and had been dishonest during the investigation."[70]

With respect to Zamora, Simpson also concluded that she had made accusations about Davis having sex with N.C. at Garcia's home based on assumptions, and that she had disclosed confidential information about those allegations to Anderson. Simpson testified that Zamora

> twice went to Daniel Anderson and told him that Kelsey Davis was
> first, flirting with this juvenile, then, next, having sex with the
> juvenile. Daniel Anderson was Andrew Carver's best friend. So
> she went to that person knowing that he was going to disclose to
> him, the guy that works in Internal Affairs and is his friend, this in
> order to try to hurt Davis. So honestly throughout this you can see
> that Zamora targeted Davis.[71]

---

[67]*Id.* at 9–10.

[68]Simpson Dep., Doc. 79-1 at 27:15–23.

[69]Doc. 76-13 at 9.

[70]*Id.*

[71]Simpson Dep., Doc. 79-1 at 24:2–10.

## 8.      Termination of Zamora's Employment

Simpson briefed Fewell on the results of her investigation of Davis and Garcia, and informed him that she believed that Zamora and Howard had not been truthful.  Fewell also reviewed Simpson's investigative report and the transcripts of the interviews she conducted.  In a January 18, 2017 memorandum to Sheriff Ash and Undersheriff Roland, Fewell "strongly" recommended that Zamora's employment "be terminated based upon potential liability, damage due to [her] poor judgment in spreading rumors and violating confidentiality."[72]  Specifically, Fewell's memorandum notes that the investigation revealed that Zamora had "discussed confidential information regarding this case and another case to Deputy Daniel Anderson, member outside chain of command.  [Zamora] also lied to Detectives during questioning."[73]

At some point, Ash and Fewell had a conversation about Fewell's January 18, 2017 memorandum, and Ash authorized Fewell to proceed with the termination of Zamora's employment.  On January 23, 2017, Fewell met with Zamora and informed her that she was fired.  Fewell read Zamora a memorandum stating the following reasons for her termination:

> A confidential internal affairs investigation was conducted regarding allegations Kelsey Davis had [an] inappropriate relationship with a juvenile in November, 2016.  The investigation revealed you discussed confidential information regarding this case and another case to Deputy Daniel Anderson, member outside the chain of command.  You also provided false information to Detectives during questioning.
>
> The Internal Affairs investigation revealed:
>
> Your misconduct violated K.S.A. 65-507, *Records of Maternity Centers and Child Care Facilities; Confidentiality*.  Your allegations created two criminal investigations (Davis and Garcia) and established a hostile work environment based on innuendos.

---

[72]Doc. 76-8 at 154.

[73]*Id.*

24

> Your misconduct violated the *UG Human Resources Guide, effective 09-29-16, Rule 2, Falsifying UG Records*, in that you provided a false written report during a [sic] Internal Affairs investigation.
>
> Your misconduct violated the *UG Human Resources Guide, effective 09-29-16, Rule 3, Dishonesty*, in that you were not truthful during questioning during the Internal Affairs investigation.
>
> Your misconduct violated the UG *Human Resources Guide, effective 09-29-16, Rule 4, Unauthorized Disclosure of UG Records*, in that you discussed details of a sensitive Internal Affairs investigation.[74]

Zamora filed a grievance of her termination, which Sheriff Ash denied. Howard was also fired.

Fewell testified that Zamora violated K.S.A. § 65-507 and improperly disclosed government records when discussing the allegations about Davis and N.C. with N.C., Howard, and Anderson. Although he testified that discussions about a juvenile among JDC staff do not generally violate § 65-507 when necessary for "operational awareness,"[75] he also stated that such discussions could potentially violate the statute when staff members are "discussing confidential information among personnel that are not privy to such" because "it's protected information not to be openly discussed among peers at that level of command."[76] Fewell testified that juvenile detention officers should report up the chain of command rather than discussing confidential information with each other.

During the grievance hearing, Ash asked Zamora why she talked to Anderson. Zamora testified that she responded, "Anderson is my friend. I thought it would be all right to talk to

---

[74]*Id*. at 2.

[75]Fewell Dep., Doc. 79-3 at 31:18–20.

[76]*Id*. at 32:2–33:22.

Anderson."[77]  Zamora recalled that in response, Ash was "just, like, no."[78]  Zamora did not tell Anderson about the ongoing investigation into Davis, and Anderson told the UG that he did not know the name of the juvenile alleged to have been involved in a sexual relationship with Davis. However, it is undisputed that both Fewell and Ash believed that Zamora had told Anderson the name of the juvenile in question.

Fewell further testified that  Zamora was not truthful in three instances, including (1) telling Anderson that Davis had sexual relations with N.C. at Garcia's house; (2) claiming that she tried to report allegations involving a different juvenile possibly staying with a staff member; and (3) stating that N.C. asked her if she had heard the rumors involving him and Davis.  Again, Anderson had told Simpson that he believed the information concerning a sexual relationship between Davis and N.C. had originated with Garcia.

Simpson testified that she concluded Zamora had been untruthful due to N.C.'s denial of her account and inconsistencies between Zamora's and Howard's statements.  However, Simpson did not talk to other JDC staff members to determine N.C.'s reputation for truthfulness.  Rather, she relied upon her review of N.C.'s phone calls, video recordings of Howard and N.C. together in the pod, and N.C.'s "shocked" reaction to the allegations in determining that his denial was credible.  Lieutenant Coppage testified that he believed N.C. had made up the rumor about a sexual relationship between him and Davis; however, Coppage believed Howard's statement that N.C. had told Howard about such a relationship.  When Simpson asked Garcia if she believed Howard was the type of officer N.C. would confide in, Garcia answered that she did not believe so because Howard is black and N.C. has made it known among JDC residents and staff that he does not like

[77]Zamora Dep., Doc. 76-7 at 222:22–24.

[78]*Id.* at 222:25.

black people. Additionally, Garcia stated in her interview that during a JDC training session, Broadus had once brought up the fact that N.C. was a liar.

In her deposition, Zamora testified that she disagreed with the findings of the termination memorandum, but agreed that she was "fired for what they feel."[79] She also testified that she was fired in retaliation for turning in Davis, a detective's wife, in her May 25, 2016 report. Zamora does not believe that she was terminated in connection with Howard's later report on Davis, because she was not involved in that report beyond telling Howard that he needed to report. Zamora does not know why, if she was terminated in retaliation for the May 2016 report, she was not fired until January of 2017. Zamora is not aware of any other JDC employee who has been terminated in retaliation for reporting child abuse or neglect, though Howard was also fired following the November 2016 investigation of Davis. Harrington continues to work at the JDC, and Olden worked there until a few months before his death in February 2018.

Although Fewell testified that one of the reasons he decided to terminate Zamora was because she had submitted a false report to Simpson during the investigation, the UG now concedes that Zamora did not submit a false report. There is no UG policy stating that an employee shall be terminated for violating K.S.A. § 65-507, and the UG has never terminated anyone for violating that statute other than Zamora and Howard.

### 9. Lack of Disciplinary Action as to Other UG Employees

Davis and Carver were engaged before the first investigation into Davis began. As noted above, in the late spring or summer of 2016, Soptic and Gunja told Carver that there was a complaint against his fiancée, that there was a video of her conduct, and that Carver would not be involved in the investigation. Soptic and Gunja did not go into the details of the allegations,

---

[79]Zamora Dep., Doc. 76-7 at 208:7–11.

but encouraged Carver to speak with Davis about his concerns. Carver did so before Davis was interviewed, and while the UG was investigating the May 2016 incident involving Davis and J.K., Davis was discussing information about the investigation with Carver, as well as with her JDC co-worker, Schuler. The UG did not discipline Soptic, Gunja, or Carver for sharing information about J.K. outside the JDC.

In addition, Anderson disclosed to Carver the later allegations regarding a sexual relationship between Davis and a former JDC resident, which Carver then repeated to Davis and Davis conveyed to Garcia. Although the UG denies that either Anderson or Carver stated the name of the juvenile in question, the UG admits that when Davis told Garcia what she had heard from Carver, Davis stated the identity of the minor, N.C. The UG admits that Davis disclosed details of a sensitive Internal Affairs investigation to Garcia.

When asked during his deposition whether people who shared information about juveniles outside the JDC chain of command should be disciplined, Fewell responded, "Absolutely."[80] The UG also testified that information and investigations involving juveniles are confidential and must remain within the JDC; such information remains confidential even after it has been improperly disclosed outside the JDC.

The UG did not discipline Anderson, Carver, Davis, or Garcia for their disclosure of information relating to Davis's alleged sexual relationship with a former resident. In fact, during the course of the second investigation conducted by Simpson, Carver was promoted a rank and became Simpson's superior. Simpson knew that Carver had been discussing the allegations involving Davis and N.C. with others. In her deposition, Simpson testified to her belief that Anderson, who repeated the allegations to Carver, was not bound by the same confidentiality

---

[80]Fewell Dep., Doc. 79-3 at 38:16–21.

obligations as Zamora because he did not work at the JDC and had no way of knowing its rules and regulations.

## III.    Analysis

### A.    Applicability of Title IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity that receives Federal financial assistance."[81]  Enacted under Congress's spending power, the statute "condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds."[82]  The statute has two primary objectives: "'[T]o avoid the use of federal resources to support discriminatory practices' and 'to provide individual citizens effective protection against those practices.'"[83]

Title IX mandates that recipients of federal financial assistance provide equal educational opportunities and protects against a wide variety of discriminatory conduct based on sex.[84]  Title IX protects both men and women from harassment based on sex, including deliberate indifference by a school to known acts of teacher-on-student or student-on-student harassment.[85]

---

[81]20 U.S.C. § 1681(a).

[82]*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1989) (citations omitted); *see also Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1098 (10th Cir. 2019) (citing *Gebser*, 524 U.S. at 286).

[83]*Gebser*, 524 U.S. at 286 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979)).

[84]*See, e.g., Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) ("Title IX prohibits discrimination by recipients of federal education funding."); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999) (referencing "Title IX's mandate for equal educational opportunities").

[85]*See Gebser*, 524 U.S. at 277 (holding that a school district may be held liable for damages under Title IX for the sexual harassment of a student by a teacher where "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct"); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 646–47 (1999) ("We thus conclude that recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority.")

Further, the statute protects an individual from retaliation for reporting conduct prohibited by Title IX.[86] There exists an implied private right of action under Title IX, and "money damages are available in such suits."[87] "A funding recipient, however, 'may be liable in damages under Title IX only for its own misconduct.'"[88]

Congress clarified through the Civil Rights Restoration Act of 1987 ("CRRA") that Title IX is to apply to *all operations* of any department, agency, or other instrumentality of a state or local government that receives federal financial assistance, including agencies or departments that receive federal aid indirectly from other state entities.[89] Thus, whether "whether a covered program or activity receives 'Federal financial assistance,' . . . is determined by reference to the 'entire' entity or 'whole' organization."[90]

Critically, however, the program in question must still be an *education* program or activity as set forth in § 1681 to be a covered by the statute's antidiscrimination mandate.[91] In amending Title IX through the CRRA to broadly extend the statute's reach to all operations of a

---

[86]*Jackson*, 544 U.S. at 178 (holding that "Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex"); *Berry v. Mission Group Kan., Inc.*, 463 F. App'x 759, 766 n.7 (10th Cir. 2012) (stating, in case involving alleged retaliation against employee for reporting incidents of sexual harassment of female students by male instructor, that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action.") (quoting *Jackson*, 544 U.S. at 173)).

[87]*Davis*, 526 U.S. at 639; *see also Farmer*, 918 F.3d at 1098.

[88]*Farmer*, 918 F.3d at 1098.

[89]20 U.S.C. § 1687; *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 553 (3d. Cir. 2017); *Jeldness v. Pearce*, 30 F.3d 1220, 1225 (9th Cir. 1994) (noting that "[t]he Senate Report for the Civil Rights Restoration Act of 1987 . . . clarified that Title IX and several other civil rights statutes applied to an entire institution receiving federal funds, and not just to the specific program or activity receiving the money . . . .").

[90]*Mercy Catholic Med. Ctr.*, 850 F.3d at 557 (citations omitted); *see also Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir. 1993) ("Since 1988, Title IX has applied to recipients of federal funds in all of their operations.") (citing 20 U.S.C. § 1687)).

[91]*Mercy Catholic Med. Ctr.*, 850 F.3d at 554–56; *Roubideaux v. N.D. Dep't of Corrs. & Rehab.*, 570 F.3d 966, 977 (8th Cir. 2009) ("The express language of Title IX prohibits discrimination in 'any *education* program' that receives federal funds." (citing 20 U.S.C. § 1681(a)).

covered entity, "Congress retained in § 1681(a) the modifier 'education' before 'program or activity.' It left 'education' undefined and gave no guidance to reconcile § 1687's broad phrase 'program or activity' with § 1681(a)'s ostensibly narrower language."[92]

The Third Circuit recently analyzed, in *Doe v. Mercy Catholic Medical Center*,[93] the question of what makes a program sufficiently educational to trigger the protections of Title IX. The court ultimately found that a private teaching hospital's operation of a residency program was sufficient to qualify it as an education program or activity under the statute.[94] The Third Circuit agreed with an earlier Second Circuit holding that a "program or activity" under § 1687 is an "education program or activity" under § 1681(a) if it has "features such that one could consider its mission to be, at least in part, educational."[95]

"Whether a program or activity is sufficiently educational under Title IX is a mixed question of law and fact. When the facts are uncontested, the judge decides the matter. Factual disputes material to her legal conclusion are, however, left for the finder of fact."[96] The Court here must give effect to the broad purpose of the Title IX and its amendments to curb the use of federal dollars to support discriminatory practices, while also enforcing the requirement that the program at issue must be an "education" program or activity.

It is undisputed here that the UG receives federal financial assistance, and the JDC is a division of the Sheriff's Office within the UG. The parties also agree that the school housed within the JDC is an "education program or activity" within the meaning of Title IX. However,

---

[92]*Mercy Catholic Med. Ctr.*, 850 F.3d at 554.

[93]850 F.3d 545 (3d Cir. 2017).

[94]*Id*. at 556–58.

[95]*Id*. at 555 (*quoting O'Connor v. Davis,* 126 F.3d 112, 117 (2d. Cir. 1997)).

[96]*Id.* at 556.

the UG argues that all of the features of the school that make it "educational" are funded and controlled by the School District, not the UG. The UG's position is that because it is the School District, rather than the UG, that "operates" the school, Title IX does not apply. Zamora counters that cases applying Title IX in the prison context do not turn on the definition of "operate," but on whether the prison is a recipient of federal financial assistance.

Under the unique facts of this case, the Court finds that Zamora may proceed with her retaliation claim under Title IX. The UG cites no case law to support its argument that the application of Title IX turns on whether it "operates" the school other than two cases stating that in the absence of a different statutory or regulatory definition, "operate" should be given its ordinary meaning.[97] There is ample precedent to support that prison education programs are within the scope of Title IX.[98] And as Zamora points out, the statute has been held to apply when courses being provided at prison facilities are taught by entities other than the prison without any particular focus on the identity of the instructor as a potentially disqualifying factor.[99] Further, even if the identity of the entity "operating" the school was of critical import here, the Court is unconvinced that the UG plays no part in the operation of the school within the

---

[97] *See Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063, 1066 (5th Cir. 1995) (holding, in context of ADA claim, that "[t]o 'operate,' in the context of a business operation, means 'to put or keep in operation,' . . . '[t]o control or direct the functioning of,' . . . [or] [t]o conduct the affairs of; manage.'") (citations omitted)); *United States v. Bestfoods*, 524 U.S. 51, 66 (1998) (construing "operator" in context of CERCLA to mean "someone who directs the workings of, manages, or conducts the affairs of a facility" relating to pollution).

[98] *See, e.g., Roubideaux v. N.D. Dep't of Corrs. & Rehab.*, 570 F.3d 966, 976–78 (8th Cir. 2009); *Lothes v. Butler Cty. Juvenile Rehab. Ctr.*, 243 F. App'x 950, 953–54 (6th Cir. 2007); *Klinger v. Dep't of Corrs.*, 107 F.3d 609, 614–15 (8th Cir. 1997); *Jeldness v. Pearce*, 30 F.3d 1220, 1224–25 (9th Cir. 1994).

[99] *See Klinger v. Neb. Dep't of Corr. Servs.*, 824 F. Supp. 1374, 1399–1400 (D. Neb. 1993) (some courses offered through and/or taught by community college), *rev'd on other grounds by Klinger v. Dep't of Corrs.*, 31 F.3d 727 (8th Cir. 1994), *cert. denied*, 513 U.S. 1185 (1995); *Roubideaux v. N.D. Dep't of Corrs. & Rehab.*, 523 F. Supp. 2d 952, 956–60 (D. N.D. 2007) (local college classes offered on-site, through correspondence, or through education release), *aff'd*, 570 F.3d 966 (8th Cir. 2009).

JDC or that the JDC is not so intertwined with the school as to be considered an education program in and of itself.

The UG acknowledges that as a "person acting as a parent" under K.S.A. § 72-3122(d)(2), the JDC is required to ensure that its residents attend school pursuant to K.S.A. § 72-3120(a).[100]  The Kansas administrative regulations pertaining to the licensing of detention centers for children further provide:

**K.A.R. 28-4-355.  Program and services.**

(a)  A written plan and daily routine shall be maintained for all juveniles which shall include: meals, rest and sleep, personal hygiene, physical exercise, recreation, counseling, education and social services.

(b)  Classroom instruction shall be provided on-site by teachers holding appropriate certification from the Kansas board of education.

(1)  Education services shall be coordinated with the local school district.  During the local school year, each juvenile shall receive a minimum of six hours of instruction per day, excluding weekends and holidays.

(2)  For each juvenile currently enrolled in a Kansas public school, contact shall be maintained with the juvenile's home school district to ensure the continuity of each juvenile's education.

(3)  A regular schedule of instruction and related educational services appropriate to the needs of each juvenile shall be provided.

---

[100]*See* K.S.A. § 72-3122(d)(2) ("'[P]erson acting as parent' means . . . a person, other than a parent, who is liable by law to maintain, care for, or support the child, or who has actual care and control of the child and is contributing the major portion of the cost of support of the child, or who has actual care and control of the child with the written consent of a person who has legal custody of the child, or who has been granted custody of the child by a court of competent jurisdiction"); K.S.A. § 72-3120(a) ("[E]very parent or person acting as parent in the state of Kansas, who has control over or charge of any child who has reached the age of seven years and is under the age of 18 years and has not attained a high school diploma or a general educational development (GED) credential, shall require such child to be regularly enrolled in and attend continuously each school year (1) a public school for the duration of the school term . . . .").

> (4)     Youth care staff shall be stationed in proximity to the
> classroom, with frequent, direct, physical observation
> of the classroom activity at least every 15 minutes, to
> provide immediate support to the teacher.[101]

Kansas law thus requires juvenile detention centers to provide for the education of their residents. Further, it is uncontested that residents of the JDC are minors who are required to attend school, as opposed to adult prisoners for whom taking courses would be optional. Although content instruction at the JDC school is provided by the School District, the JDC houses the school and its staff members are tasked with ensuring the safety and security of students, a critical function of any educational institution. Specifically, in compliance with the regulation set forth above, at least one juvenile detention officer is stationed in each JDC classroom and directly observes classroom activity to provide security and to help ensure order. Given Kansas law and these undisputed facts, the Court cannot credit the UG's argument that it does not in any way "control[], direct[], manage[], [or] conduct[]" the school.[102]

The UG's argument that the Court should consider only the instructive facets of the JDC school in deciding whether Title IX applies, in isolation from the JDC as a whole, creates an artificial distinction and ignores that the education of its residents is one of the JDC's core functions. Because the JDC is required to ensure that its minor residents receive education services—through coordination with the School District and by providing a safe and secure space for instruction—its mission is, at least in part, "educational" within the meaning of Title IX. [103] Adopting the UG's contrary position would create a situation in which School District

---

[101]Kan. Admin. Regs. § 28-4-355 (2019).

[102]Doc. 76 at 30.

[103]*Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 555 (3d. Cir. 2017) ("The Supreme Court has twice instructed . . . that, to give Title IX the scope its origins dictate, [courts are] to accord it a sweep as broad as its language. And indeed the ordinary meaning of 'education'—a word Congress has yet to define—is 'very broad.'"

employees working at the JDC school would be protected against retaliation for reporting conduct prohibited by Title IX, but JDC staff members providing security for student residents would not be similarly protected.  This result would frustrate the purpose of the statute.

The typical application of Title IX in the prison context involves a challenge to unequal educational opportunities for men and women prisoners, and it is within this context that courts have held that Title IX applies to entire state prison systems, requiring a comparison of educational opportunities available to men and women throughout those systems as a whole.[104] In this case, in contrast, Zamora's retaliation claim does not require the Court to look beyond what happened at the JDC.  Thus, the Court does not pass on whether any person jailed in or employed by a state prison facility that receives federal funds and provides an "education program or activity" potentially has a Title IX cause of action regardless of context.  Rather, the Court finds on the unique facts of this case that the JDC itself is an "education program or activity" within the meaning of Title IX and that Zamora may bring a claim for retaliation under that statute.

### B.  Retaliatory Discharge in Violation of Title IX

Retaliation against a person because that person has complained of sex discrimination constitutes intentional discrimination "on the basis of sex" in violation of Title IX.[105]  In

---

(citing *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005)) (quoting *Roubideaux*, 570 F.3d at 977)).

[104]*See, e.g., Roubideaux*, 570 F.3d at 976 ("A state's prison system as a whole qualifies as a program or activity within the meaning of Title IX.") (citation omitted)); *Klinger v. Dep't of Corrs.*, 107 F.3d 609, 616 (8th Cir. 1997) ("When considering single-sex prisons, the only logical and workable application of the definition of 'program or activity' under Title IX requires comparison of educational opportunities for female and male prisoners within the entire system of institutions operated by a state's federally-funded correctional department or agency, taking into account the objective differences between the male and female prison populations such as penological and security considerations as are necessary to accommodate in this unique context.") (citing *Jeldness v. Pearce*, 30 F.3d 1220, 1228–29 (9th Cir. 1994))).

[105]*Jackson*, 544 U.S. at 173–74.

evaluating Title IX retaliation claims, courts have looked to the analogous and more developed case law governing Title VII retaliation claims.[106]

The plaintiff bears the ultimate burden of proving that her employer intentionally discriminated against her,[107] but may do so "through either direct evidence or circumstantial evidence that creates an inference of intentional discrimination."[108] Where the plaintiff seeks to use circumstantial evidence to show discriminatory intent, as here, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*.[109] Under that framework, the plaintiff must establish a prima facie case of retaliation by demonstrating: (1) that she engaged in protected opposition to discrimination; (2) that a reasonable person would have found the challenged action materially adverse; and (3) that there is a causal connection between the protected activity and the materially adverse action.[110] The plaintiff's burden of establishing a prima facie case is "not onerous."[111]

If the plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate non-retaliatory reason for the adverse employment action.[112] If the employer is able to offer a legitimate non-retaliatory reason, the burden shifts back to the plaintiff to show that the

---

[106]*See, e.g., Preston v. Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206–07 (4th Cir. 1994) (collecting cases); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 832 (10th Cir. 1993) (stating Title VII provides "the most appropriate analogue when defining Title IX's substantive standards") (citation omitted)); *Tackett v. Univ. of Kan.*, 234 F. Supp. 3d 1100, 1108–09 (D. Kan. 2017).

[107]*Bennett v. Windstream Comm'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (citing *Riser v. QEP Energy*, 776 F.3d 1191, 1199 (10th Cir. 2015); *Adamson v. Multi Cmty. Diversified Servs., Inc*., 514 F.3d 1136, 1145 (10th Cir. 2008)).

[108]*Id*. (citing *Riser*, 776 F.3d at 1199).

[109]411 U.S. 792 (1973); *C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1336 (D. Kan. 2008) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211 (10th Cir. 2008)).

[110]*C.T.*, 562 F. Supp. 2d at 1336 (citing *Somoza*, 513 F.3d at 1212).

[111]*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Tabor v. Hilti, Inc*., 703 F.3d 1206, 1216 (10th Cir. 2013) (citing *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)).

[112]*McDonnell Douglas*, 411 U.S. at 802.

employer's stated reason is a pretext for discrimination.[113]  "A plaintiff demonstrates pretext by showing that the employer's proffered explanation is unworthy of credence."[114]  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."[115]  Again, despite the shifting framework, the ultimate burden of persuasion remains with the plaintiff.[116]

### 1.  Elements of a Prima Facie Case

There is no dispute that Zamora has established the second element of a prima facie case of retaliation, a materially adverse employment action, by demonstrating that the UG terminated her employment.  The UG asserts that Zamora has not established the first and third elements.

### a.  Protected Activity

Regarding the first element, the UG contends that Zamora's reporting concerning Davis did not constitute protected opposition to discrimination because her written May 25, 2016 report did not expressly mention Davis engaging in discrimination or harassment.  Rather, Zamora's written report merely stated what she had observed—Davis and J.K. walking with J.K.'s arm around Davis's waist and Davis's hand on J.K.'s shoulder.

In a retaliation case, the plaintiff engages in protected opposition by opposing a practice made unlawful by the statute at issue.[117]  While it is true that the plaintiff "must convey to the

---

[113]*Id.* at 804.

[114]*Berry v. Mission Group Kan., Inc.*, 463 F. App'x 759, 766 (10th Cir. 2012) (quoting *Jaramillo v. Colo. Judicial Dep't.*, 427 F.3d 1303, 1309 (10th Cir. 2005)).

[115]*Bennett v. Windstream Comm'ns, Inc.*, 792 F.3d 1261, 1266–67 (10th Cir. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 148 (2000)).

[116]*Richardson v. Blue Cross/Blue Shield of Kan., Inc*., 196 F. Supp. 2d 1174, 1181 (D. Kan. 2002) (citations omitted).

[117]*McElroy v. Am. Fam. Ins*., 630 F. App'x 847, 851 (10th Cir. 2015) (citing *Hinds v. Sprint/United Mgmt. Co*., 523 F.3d 1187, 1203 (10th Cir. 2008); *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002)).

employer his or her concern that the employer has engaged in a practice made unlawful,"[118] "no magic words" are required to do so.[119]  Given the undisputed facts of this case, the UG cannot genuinely argue that it did not understand Zamora's May 25, 2016 written report—as well as her verbal account when interviewed by Kingston of an additional instance of inappropriate contact between Davis and J.K.—to raise the question of sexually-motivated behavior by Davis toward a minor JDC resident.  Zamora told Kingston that she found Davis's conduct inappropriate because "you don't act like that with children."[120]  Although a plaintiff's failure to communicate to her employer her concern about discrimination may preclude a retaliation claim where the employer does not know that the plaintiff has engaged in protected opposition to discrimination,[121] the facts here show that the UG was well aware, based in part on Zamora's reports, of the need to investigate whether Davis had been inappropriately sexual with minor residents.  Thus, the Court rejects the UG's contention that Zamora did not engage in protected opposition to discrimination when she reported her observations of Davis's physical behavior toward a minor resident.

The UG also argues that Zamora cannot establish the first element of a prima facie case because she had no reasonable, good-faith belief that harassment was occurring when she reported on Davis.  While a retaliation plaintiff need not prove that the complained-of sex discrimination actually occurred, the plaintiff must have had a reasonable, good-faith belief that she was engaging in protected opposition to discrimination when making her report.[122]  The

---

[118]*Hinds*, 523 F.3d at 1203.

[119]*Id.*

[120]Doc. 76-10 at 5.

[121]*Petersen*, 301 F.3d at 1188–89.

[122]*Clark v. Cache Valley Elec. Co.*, 573 F. App'x 693, 700 (10th Cir. 2014) (citing *Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1172 (10th Cir. 2003)); *Held v. Ferrellgas, Inc.*, 505 F. App'x 687, 690–91

"'reasonable good-faith belief' test has both subjective and objective components. 'A plaintiff must not only show that [she] *subjectively* (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, but also that [her] belief was *objectively* reasonable in light of the facts and record presented.'"[123] "To determine whether it was objectively reasonable for a person in [Zamora's] position to believe that [she] was opposing prohibited conduct, [the Court looks] to the underlying substantive law."[124]

Given its finding that Title IX applies to the JDC on the facts of this case, and given that juvenile detention officers were responsible for supervising inmates, the Court looks to the underlying substantive law on teacher-on-student sexual harassment. A teacher's sexual harassment or abuse of a student constitutes discrimination on the basis of sex in violation of Title IX.[125] One element required to impose liability under Title IX on an entity receiving federal financial assistance is that the teacher's sex-based harassment of a student must be "so severe, pervasive and objectively offensive that it . . . deprived the victim of access to the educational benefits or opportunities provided by the school."[126]

The UG contends that the behavior Zamora witnessed and reported was nowhere near severe, pervasive, and objectively offensive enough that Zamora could have reasonably believed Davis's behavior amounted to sexual harassment in violation of Title IX. However, for the Court to determine that Zamora held a reasonable belief that she was opposing prohibited

---

(10th Cir. 2012) (citing *Crumpacker*, 338 F.3d at 1171); *Berry v. Mission Group Kan, Inc*., Case No. 08-2439-JPO, 2010 WL 11628372, at *3 (D. Kan. Mar. 16, 2010) (citations omitted).

[123]*Clark*, 573 F. App'x at 701 (quoting *Little v. United Techs., Carrier Transicold Div*., 103 F.3d 956, 960 (11th Cir. 1997)).

[124]*Id*. (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001) (per curiam)).

[125]*See, e.g., Gebser v. Lago Vista Indep. Sch. Dist*., 524 U.S. 274, 280–81 (1998); *J.M. ex rel. Morris v. Hilldale Indep. Sch. Dist. No. 1-29*, 397 F. App'x 445, 450 (10th Cir. 2010).

[126]*J.M. ex rel. Morris*, 397 F. App'x at 450 (quoting *Davis v. Monroe Cty. Bd. of Educ*., 526 U.S. 629, 650 (1999)).

conduct does not require the Court to first find that the conduct she reported was severe and pervasive enough to be unlawful because "a meritorious retaliation claim will stand even if the underlying discrimination claim fails."[127]  As recently explained by the Seventh Circuit in the context of Title VII:

> [A] retaliation claim isn't doomed simply because the complained-of conduct was not in fact an unlawful employment practice; rather, the plaintiff must have "a sincere and *reasonable* belief that he is opposing an unlawful practice."  "The objective reasonableness of the [plaintiff's] belief is not assessed by examining whether the conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by the statute."[128]

The two instances of contact between Davis and J.K. that Zamora initially reported involved: (1) Davis and J.K. walking with J.K.'s arm around Davis's waist and Davis's hand on J.K.'s shoulder; and (2) Davis and J.K. sitting next to each other, with J.K.'s head resting on Davis's shoulder.  While Zamora acknowledged in her deposition that Davis's conduct was not explicitly sexual because it did not involve intercourse or groping, such behavior would nonetheless seem suspect to any reasonable person observing it in the context of a teacher-student or guard-inmate relationship.  The UG's sexual harassment policy, which admittedly is intended to address interactions among employees, aptly instructs that sexual harassment may be subtle and indirect, and includes conduct between individuals in a hierarchal relationship or conduct aimed at coercing an individual to participate in an unwanted sexual relationship.  Further, JDC rules prohibit physical touching between residents and staff members.  Consistent

---

[127] *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998) (citation omitted); *Jenkins v. Educ. Credit Mgmt. Corp.*, 212 F. App'x 729, 735–36 (10th Cir. 2007) (citing *Sanchez*, 164 F.3d at 533).

[128] *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 706–07 (7th Cir. 2000); *Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008)), *cert. denied*, 137 S. Ct. 1115 (2017).

with UG policy and JDC rules, Zamora's superiors told her she was right to report Davis's conduct in May 2016, and Davis thereafter stopped her prior practice (which had been observed by Zamora) of bending over tables while conversing with residents. Further, the fact that Harrington, Olden, and Paden all reported physical conduct by Davis toward minors, including conduct that was "more than touching" per Paden's report, suggests a possible pattern of sexual conduct by Davis towards minor residents.

The Court is unwilling to find, on the record before it, that Zamora did not engage in protected opposition by reporting Davis's inappropriate physical contact with a juvenile inmate. "The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity," with teacher-on-student harassment being more likely to violate Title IX than peer-on-peer harassment.[129] The record in this case is replete with facts that cause this Court concern about a potentially sexually-charged environment at the JDC, where adult guards wield authority and influence over vulnerable, at-risk minors. This is the environment in which Zamora worked, and the Court finds sufficient evidence that she held both a good-faith subjective belief and an objectively reasonable belief that she was reporting conduct forbidden by Title IX. Zamora has met her non-onerous burden of establishing the protected-opposition element of her prima facie case.

### b. Causal Connection Between Protected Activity and Materially Adverse Action

Satisfying the causal-connection element of a prima facie case of retaliation requires "evidence of circumstances that justify an inference of retaliatory motive, such as protected

---

[129]*Davis*, 526 U.S. at 653.

conduct closely followed by adverse action."[130]  "But '[u]nless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."[131]

The UG contends that Zamora has not shown that her discharge was causally connected to her report on Davis because the period of time between her May 2016 report and her firing is too long (eight months) to establish the necessary causal inference and she has failed to come forward with additional evidence to support causation.  Zamora counters that the length of time between the protected activity and the adverse action should be measured from the date on which the UG made a final decision on its initial investigation of Davis, which occurred on October 31, 2016. Zamora claims that her firing three months later is sufficiently close in time to establish a direct, causal connection.

The Tenth Circuit has not announced a bright-line rule on the temporal proximity required between protected opposition and a materially adverse action.  Rather, the court has explained:

> It appears clear that, if the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference; but it is equally patent that if the adverse action occurs three months out and beyond from the protected activity, the action's timing alone will not be sufficient to establish the causation element. . . .  However, where along the temporal line beyond one and beyond one and one-half months but short of three months, the adverse action's timing ceases to be sufficient, standing alone, to establish the requisite causal inference is less than pellucid.[132]

---

[130]*Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982) (citations omitted); *see also O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).

[131]*O'Neal*, 237 F.3d at 1253 (citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997)).

[132]*Conroy v. Vilsack*, 707 F.3d 1163, 1181–82 (10th Cir. 2013) (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004)).

The UG is correct that the relevant starting point is not when its investigation of Davis concluded, but when the protected activity occurred.[133]  Zamora's firing in January 2017 is too far removed from her May 2016 report to support a causal connection in the absence of additional evidence.  And even if the Court were to accept Zamora's contention that the length of time between the protected activity and the adverse action should be measured from the date on which the UG made its disciplinary decision as to Davis on October 31, 2016, there would still be roughly three months between the protected activity and the adverse action, almost certainly requiring Zamora to offer additional evidence to establish causation.  However, drawing all inferences in Zamora's favor, the record in this case could alternatively allow the Court to find that she engaged in protected activity as late November 30, 2016.

Although Zamora testified that she does not believe she was fired for Howard's November 2016 report regarding a possible sexual relationship between Davis and N.C., Howard's report spawned a second investigation into Davis.  That investigation was conducted not by an outside entity, but by Detective Simpson from the Sheriff's Office, who was a subordinate of Davis's fiancé, Captain Carver.  Simpson interviewed Zamora on November 30, 2016, and Zamora reported to Simpson not only what she had heard about a rumored sexual relationship between N.C. and Davis, but also what she had previously reported (in writing and verbally to Kingston) in the spring of 2016 about Davis's conduct with J.K.  There is nothing in the record to suggest that Simpson was previously aware of Zamora's prior reports.

The Supreme Court has held that an employee can oppose discrimination

> by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on

---

[133]*Id.* at 1181.

> her own initiative but not one who reports the same discrimination
> in the same words when her boss asks a question.[134]

Zamora was terminated less than two months after her statement to Simpson, creating a much closer call on whether she would need additional evidence to support a causal connection between her protected opposition to conduct prohibited by Title IX and her termination. In any event, whether the relevant time period is two or eight months, Zamora contends that the evidence she offers to show pretext also establishes the causation element of her prima facie case, and "[t]he Court may consider evidence tending to establish the weakness of a proffered non-discriminatory reason not only in the pretext stage of a retaliation claim, but also in connection with establishing causation as part of a prima facie case."[135] Through her evidence of pretext, discussed below, Zamora has also met her non-onerous burden of establishing the causal-connection element of her prima facie case of retaliation.

## 2. Pretext

If the plaintiff establishes a prima facie case of discrimination, "the . . . burden shifts to the defendant to articulate a facially nondiscriminatory reason for the challenged employment action."[136] While the defendant need not prove at this stage that its non-discriminatory motivation for the decision was "bona fide," the reason articulated must be "reasonably specific and clear."[137] The UG has met its burden here, stating that Zamora was fired for breaching confidentiality and for dishonesty in the course of the second investigation into Davis's conduct, resulting in unwarranted criminal investigations into Davis and Garcia and a hostile work

---

[134] *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.,* 555 U.S. 271, 277 (2009).

[135] *Mancell v. McHugh*, 639 F. App'x 527, 531 (10th Cir. 2016) (citing *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007)); *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 n.5 (10th Cir. 2007).

[136] *Beams v. Norton*, 256 F. Supp. 2d 1203, 1214–15 (D. Kan. 2003) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)).

[137] *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992).

environment.  Thus, the burden returns to Zamora to show by a preponderance of the evidence that the nondiscriminatory reasons offered are merely pretext.[138]

A plaintiff may "demonstrate[] pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence."[139]  In other words, a "plaintiff can establish pretext by showing the defendant's proffered nondiscriminatory explanations for its actions are 'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief.'"[140]

Evidence of pretext "may take a variety of forms," and a plaintiff "may not be forced to pursue any particular means of demonstrating that [a defendant's] stated reasons are pretextual."[141]  The Tenth Circuit has explained that:

> A Plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.[142]

---

[138]*Stinnett v. Safeway, Inc*., 337 F.3d 1213, 1218 (10th Cir. 2003) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Flasher*, 986 F.2d at 1321); *Beams*, 256 F. Supp. 2d at 1215 (citing *Danville v. Reg'l Lab Corp*., 292 F.3d 1246, 1250 (10th Cir. 2002)).

[139]*Stinnett*, 337 F.3d at 1218 (quoting *Rea v. Martin Marietta Corp*., 29 F.3d 1450, 1455 (10th Cir. 1994)).

[140]*E.E.O.C. v. C.R. England, Inc*., 644 F.3d 1028, 1038–39 (10th Cir. 2011) (quoting *Johnson v. Weld Cty., Colo*., 594 F.3d 1202, 1211 (10th Cir. 2010)) (citing *Zamora v. Elite Logistics, Inc*., 478 F.3d 1160, 1166 (10th Cir. 2007)).

[141]*Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1230 (10th Cir. 2000) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 187–88 (1989)).

[142]*Id.* (internal citations omitted).

To show that a defendant acted contrary to an unwritten policy or to company practice, a plaintiff often provides "evidence that [she] was treated differently from other similarly-situated employees who violated work rules of comparable seriousness."[143]

However, "[m]ere allegations are insufficient,"[144] and "[t]he plaintiff's own conclusory opinions about . . . the employer's motives do not give rise to a material factual dispute."[145]  "In determining whether the proffered reason for a decision was pretextual, [the court] examine[s] the facts as they appear to the person making the decision[,] not the plaintiff's subjective evaluation of the situation."[146]  "Regardless of which theory of pretext the plaintiff asserts, '[the Court's] role isn't to ask whether the employer's decision was wise, fair or correct, but whether [it] honestly believed [the legitimate, nondiscriminatory] reasons [it gave for its conduct] and acted in good faith on those beliefs."[147]  Finally, in deciding whether the Zamora has made a sufficient showing of pretext, the court "must consider the evidence as a whole."[148]

In support of her pretext argument, Zamora asserts that each of the reasons for her termination stated in Fewell's termination memorandum are either not credible or have been proven false through the testimony of UG representatives.  Zamora also contends that the UG's rules and policies were applied differently to her than to other employees.  Specifically, she

---

[143]*Id.* (citing *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)); *see also Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167–68 (10th Cir. 2007) (quoting *Kendrick*, 220 F.3d at 1230).

[144]*Beams v. Norton*, 256 F. Supp. 2d 1203, 1215 (D. Kan. 2003) (citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997)).

[145]*Id.* (quoting *Bullington v. United Airlines*, 186 F.3d 1301, 1318 (10th Cir. 1999)).

[146]*Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013) (quoting *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011) (third alteration in original)); *see also Conroy v. Vilsack*, 707 F.3d 1163, 1174 (10th Cir. 2013) (citing *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011)).

[147]*Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (quoting *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010)) (first alteration added); *see also Kendrick*, 220 F.3d at 1231 (citations omitted).

[148]*Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

contends that Davis violated UG rules and policy when she engaged in multiple acts of inappropriate physical contact with a juvenile, lied to investigators, and widely discussed the allegations involving a juvenile with individuals both inside and outside the JDC. Zamora argues that other members of the Sheriff's Office violated confidentiality by telling Carver of the allegations involving Davis, and that Carver violated confidentiality by speaking to Davis about those allegations before she was ever interviewed. Zamora argues that although Carver, Davis and their friends widely discussed the allegations involving a juvenile, none of them were disciplined or terminated for such conduct as Zamora was.

The Court agrees that Zamora has produced sufficient evidence to establish pretext. First, there is no dispute that Zamora did not submit a false written report during Simpson's investigation, which Fewell testified was one basis for her termination. Second, regarding the UG's contention that Zamora was dishonest during questioning, the record as a whole contains enough weaknesses and contradictions with regard to whether the UG honestly believed that Zamora lied during the second investigation of Davis to make summary judgment inappropriate.

The UG contends that Zamora lied when she told Anderson about Davis having sex with N.C. at Garcia's house, when she claimed she had previously tried to report incidents involving a different juvenile, and when she told Simpson what she had heard from N.C. concerning rumors circulating about him and Davis. The record is unclear, however, whether the information about Davis and N.C. having sex at Garcia's house originated with Zamora, Howard, N.C., or Garcia— Anderson told Simpson during the second investigation that he believed Zamora had obtained this information from Garcia. Further, during the first investigation of Davis, the UG concluded that Zamora truthfully reported the inappropriate physical contact between Davis and J.K., whereas the record contains evidence relating to N.C.'s propensity for untruthfulness. Yet

during the second investigation, the UG credited N.C.'s version of events over Zamora's. Further, although the UG contends that Zamora and Howard's accounts were inconsistent, Simpson testified that Zamora was probably truthful when she stated that she told Howard that he was a mandated reporter and needed to report what N.C. had told him about Davis. The Court concludes that Zamora has presented sufficient evidence to permit a jury to infer that the UG's statement that she was fired for dishonesty was pretext.

As to the third stated reason for Zamora's termination, the parties disagree about whether she violated the JDC's Release of Information policy and K.S.A. § 56-507. Zamora contends that she did not violate confidentiality under either because she was on the receiving end of information from Howard and N.C. and because she did not disclose to anyone outside the Sheriff's Office. The UG correctly asserts that whether Zamora actually violated the statute is immaterial as long as Fewell and Ash legitimately believed she had. However, Zamora has presented evidence that the UG failed to discipline employees who violated rules of comparable seriousness which, in turn, calls into question whether the UG acted in good faith in firing Zamora.

There is no UG policy stating that an employee shall be terminated for violating § 65-507, and the UG has never terminated anyone for violating that statute other than Zamora and apparently Howard. The record is silent as to the UG's policy on termination of employment for violation of its Release of Information policy. When arguing that the UG acted contrary to an unwritten policy or practice by firing her but not similarly-situated employees who violated work rules of comparable seriousness, Zamora bears the burden of demonstrating that she is, in fact,

"similarly situated to the employees to whom [she] is comparing [herself]," [149] "An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline.'"[150] "In determining whether two employees are similarly situated, a 'court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees.'"[151] "The infractions giving rise to the comparison need not involve exactly the same offenses; they need only be of comparable seriousness."[152]

Zamora contends that Gunja, Soptic, Carver, Anderson, Davis, and Garcia were not disciplined for discussing information about a juvenile in much the same manner Zamora did. The UG contends that these individuals are not similarly situated to Zamora and did not violate rules of similar seriousness. Citing to Simpson's opinion as stated in her deposition testimony, the UG contends that the JDC's Release of Information policy and K.S.A. § 56-507 do not apply to Sheriff's Office employees working outside the JDC. Specifically with respect to Soptic and Gunja, the UG contends that Zamora has not shown that they lacked the legal authority and discretion to share with Carver the allegations against his fiancée, and that Soptic implicitly authorized Carver to discuss the allegations with Davis.

---

[149]*Kelley v. Goodyear Tire and Rubber Co.*, 220 F.3d 1174, 1178–79 (10th Cir. 2000) (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 532 (10th Cir. 1994)).

[150]*Kendrick*, 220 F.3d at 1232 (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)).

[151]*McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (quoting *Aramburu*. 112 F.3d at 1404); *see also Kendrick*, 220 F.3d at 1232 (citation omitted).

[152]*E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir. 1992) (citing *McAlester v. United Air Lines*, 851 F.2d 1249, 1260 (10th Cir. 1988)); *see also Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 541–42 (10th Cir. 2014) ("When comparing different treatment of similarly-situated employees, 'the comparison need not be based on identical violations of identical work rules; the violations need only be of comparable seriousness.'") (quoting *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995))).

This line of reasoning gives the Court some pause, given the undisputed fact that the JDC is a division of the Sheriff's Office within the UG. The UG seems to be arguing that Sheriff Ash, who has charge and custody of the JDC by law, and his Sheriff's Office employees who do not work inside the JDC, do not share the obligation keep information concerning juveniles confidential. On its face, § 56-507 is not so limited, stating that certain information pertaining to juvenile residents "shall be confidential and shall not be made public in a manner which would identify individuals."[153] Setting aside the issue of whether anyone in this case actually violated the statute, which is not at all clear, it makes little sense that the Sheriff's Office as a whole would not be bound by this prohibition. In any case, Davis and Garcia—who held the same position as Zamora, were subject to the same confidentiality rules and policies, and had the same supervisor—discussed allegations involving juveniles without facing repercussions. The UG contends that Davis resigned before she could be disciplined, but there is no evidence that either she or Garcia faced repercussions for their role in discussing confidential information outside the chain of command.

The UG also contends that Zamora's violation of confidentiality was of a different, more serious nature because she improperly disclosed information she learned first-hand in the course of her duties at the JDC, whereas "the Sheriff's Office could have reasonably viewed the disclosure of 'confidential' information that had been learned second-, third-, or fourth-hand and that was not acquired or disclosed in the performance of official duties as less serious than the disclosure of confidential information obtained on the job."[154] Again, however, there is a dispute as to whether the information relayed to Anderson concerning a relationship between Davis and

---

[153]K.S.A. § 56-507(b).

[154]Doc. 82 at 41.

N.C. originated with Zamora as opposed to N.C., Howard, or Garcia. Further, the UG contends that Zamora lied when she claimed to have heard this rumor directly from N.C. himself, a position at odds with the UG's contention that Zamora obtained confidential information *first-hand* and that she violated K.S.A. § 56-507 in disclosing information *to* N.C.

The Court is not convinced that Zamora has failed to show that the UG acted contrary to company practice by failing to discipline or terminate other employees who violated rules of comparable seriousness but, in any case, need not base its finding of sufficient evidence of pretext on the UG's failure to discipline others for violating confidentiality. For even if Zamora has failed to show that similarly situated employees violated confidentiality rules of comparable seriousness, Paden's report concerning Davis and Garcia raises the possibility that both officers violated both JDC policy and Kansas law by engaging in touching of a sexual nature with residents and bringing contraband into the facility for residents.

These allegations against Davis and Garcia are arguably much more serious than sharing confidential information with others under the umbrella of the Sheriff's Office, yet Paden's report was never even investigated—despite the fact that Kingston was at that time in the process of investigating similar conduct by Davis. While the UG highlights the fact that other employees, including Harrington and Olden, also reported on Davis but were not fired, these individuals reported on Davis in the context of the first investigation, which was conducted by an outside entity rather than Carver's direct subordinate in the Sheriff's Office. Zamora has established a genuine and material factual issue as to whether she was punished more harshly than similarly situated employees who violated rules of comparable seriousness, and a reasonable jury could therefore infer that the UG's claim that she was fired for violating confidentiality was pretext for unlawful retaliation.

Viewing the evidence as a whole and in the light most favorable to Zamora, the Court concludes that the facts of this case satisfy the third element of her prima case and give rise to an inference of pretext. The Tenth Circuit has explained that "'a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'"[155] "The plaintiff need not show both that the defendant's reasons were a pretext and that the real reason was discrimination—the fact of pretext alone may allow the inference of discrimination."[156] Accordingly, the UG's motion for summary judgment is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that UG's Motion for Summary Judgment (Doc. 75) is **denied**.

**IT IS SO ORDERED.**

Dated: November 15, 2019

s/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

---

[155] *Doebele v. Sprint United/Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

[156] *Id.* at 1135–36 (citing *Reeves*, 530 U.S. at 146–49).